[No. 15036.    Department One.    April 1, 1919.]

LOCOMOTIVE EXCHANGE, INCORPORATED, *Respondent*, v. RUCKER BROTHERS *et al., Appellants.*[1]

BAILMENT (3)—CARE AND USE OF PROPERTY—SERVANTS OF LESSEE OR LESSOR. Where the lease of a logging engine required the lessor to furnish an engineer satisfactory to the lessee, and who was to be under the control of the lessee's superintendent, he was the servant of the lessee, in the absence of express provision to the contrary; making the lessee liable for loss of the engine through the engineer's negligence (CHADWICK, C. J., dissenting).

INTEREST (7)—ACCRUAL—UNLIQUIDATED CLAIMS. Interest on an unliquidated claim for damages runs only from the date of judgment.

COSTS (62)—ON APPEAL—MORE FAVORABLE JUDGMENT. Appellants, having obtained a substantial modification of the judgment of the lower court, are entitled to their costs on appeal.

Appeal from a judgment of the superior court for Snohomish county, Bell, J., entered March 26, 1918, upon the verdict of a jury rendered in favor of the plaintiff, in an action on contract. Affirmed, except as to interest.

*Coleman & Fogarty* and *W. P. Bell,* for appellants.
*Edwin H. Flick,* for respondent.

MACKINTOSH, J.—The respondent rented to appellant, to be used in their logging operations, a Climax logging locomotive. The agreement for the rental of the locomotive contained these provisions:

"You [the appellants] are to become responsible for the engine after it arrives at your spur, and after you are through with it you are to deliver it back to your siding on the Great Northern Railway, in as good condition as you received it, with the exception of the natural wear, and we [the respondent] are to

[1]Reported in 179 Pac. 859.

accept the locomotive at your siding under the above conditions and release you from all further responsibility and expense, after it has been inspected by the writer. It is also agreed that I [the respondent] am to furnish an engineer and if he is not satisfactory at any time, under the direction of your superintendent, I am to be notified so that I can furnish another man that I know is familiar in running gear locomotives.''

The locomotive was delivered to the appellants and the respondent sent an engineer who reported to the appellants' superintendent. This engineer was to be, and actually was, paid for his services by the appellants. After having been operated for some time, the appellants' logging road was altered so that at one point it would run over a grade of five and one-half to six per cent. On March 27, 1916, the engineer started down this grade, attempting to take down twelve loaded cars, which it became impossible for the engine to hold on the grade, the train thus getting beyond control and colliding with four loaded cars previously left on the flat ground at the foot of the grade. In this collision, the engine was practically demolished. The respondent then began suit to recover the damages, which resulted in a verdict in its favor.

The respondent claimed that it had warned appellants' camp foreman that the engine could not take down grade more cars than it could take up, and that the limit of safety would be from four to six cars, and that the camp foreman and the conductor in charge of the train were guilty of negligence in causing twelve cars to be placed on the train, and that they were further negligent in leaving on the main track of the railroad, at the foot of the grade, the four loaded cars with which the train collided, for the reason that about one thousand feet beyond the place

where the loaded cars were left was a "Derail", and that the accident would not have occurred had the loaded cars been placed beyond this point. The appellants' claim is that the engineer had informed their employees that he could take the twelve cars down the grade safely, and he was the one responsible for having left the four loaded cars on the main line, and that the engineer was the agent of the respondent.

The case, in its final analysis, is resolved into the determination of the status of the engineer as that is provided for in the contract of lease. If the engineer were the agent of the respondent, the appellants would not be responsible for the results of his conduct in handling the train. If, on the other hand, he were the employee of the appellants, their liability would attach. The lease contract does not establish the ordinary relationship incident to bailment, but is a special contract of bailment which "prevails against general principles of law applicable in the absence of an express agreement." *Patterson v. Wenatchee Canning Co.*, 59 Wash. 556, 110 Pac. 379; *Alaska Coast Co. v. Alaska Barge Co.*, 79 Wash. 216, 140 Pac. 334, L. R. A. 1915 C 423.

By the contract, the appellants were charged with the duty of returning the locomotive "in as good condition as you received it," and unless the respondent or its agent were responsible for the injury, the appellants' obligation to comply with the terms of the contract would have rendered them liable. The appellants assert "that the engineer furnished by the plaintiff was under the control of the plaintiff and was the plaintiff's representative, and any injury that happened to the locomotive happened while the plaintiff's own agent was in charge thereof"—citing many authorities which would deny the respondent's right

of recovery if the foregoing statement were in truth the relation of the parties. *Bertrand v. Hunt,* 89 Wash. 475, 154 Pac. 804; *Kingsley v. Standard Lumber Co.,* 84 Wash. 189, 146 Pac. 369.

The statement of fact that the engineer was the respondent's agent is based on the interpretation of the clause of the contract which provides that the respondent is to furnish the engineer, and if he were unsatisfactory, that the respondent was to be notified and it would send a new man to take his place. It is argued from that that it was the intention of the parties that the locomotive should be under the control and charge of the respondent, and that this clause shows that the appellants had no authority to assume any control over the locomotive; for, if the engineer furnished by the respondent were not satisfactory, the appellants could not substitute a man in his place of their own choice; that the engineer, being the respondent's agent, he must know the condition of the road and the extent of load that the engine could safely handle.

We can heartily agree with the law as argued for by the appellants, if the contract is to be looked at through their eyes, but as we see the contract it does not present the same picture. The contract, read as a whole, and the testimony given at the trial, establishes a contract for the lease of an engine, the lessor to furnish a person familiar with it for the benefit of both the lessor and lessee, but the control of the engine and the engineer in the use of the engine for the purpose for which it was leased to be in the hands of the lessee, the engineer taking his orders from the officers and foreman of the logging company; he, on account of his knowledge of the engine and the care which he was supposed to exercise in keeping it

in condition and in the mechanical operation of it, assisting both the owner and the logging company and seeing that the locomotive was kept fit to perform its services so that it could be returned to the owner in its original good condition. Upon this theory, the case was properly submitted to the jury by the trial court, and the instructions which are complained of and those which are requested and refused were properly given and properly refused as being consistent or inconsistent with this theory.

The question as to whose agent or employee the engineer was is one which is resolved by the determination as to who controlled him; the question of his pay or of his selection are material only as they may throw light upon the question of control. Evidence went to the jury on this matter showing that appellants had control of the makeup of the train. The contract itself provided that the engineer should be under the control of the appellants' superintendent and there was other evidence in the case showing that this was the true situation. Where such control exists, the person under the control is the employee of the one controlling him; or, in other words, the agent, employee, or servant of a lessor, accompanying a leased chattel as the operator thereof, such operation being conducted in the course of the lessee's business and under the direction of the lessee, will be held to be, during the term of such lease, the agent, employee, or servant of the lessee, in the absence of express provision in the contract of lease to the contrary. *Alaska Coast Co. v. Alaska Barge Co., Bertrand v. Hunt,* and *Kingsley v. Standard Lumber Co., supra.* In the recent case of *Olsen v. Veness,* 105 Wash. 599, 178 Pac. 822, this court said:

"To our minds, the question of control of operation is the determining factor in this case. The respond-

ents, in the course of business, had transferred the vehicle and driver to the control of the hirer, who alone could say where and in what the work of the truck should thereafter consist, and if this effected a transfer of control it must, *ipso facto,* have effected a transfer of responsibility.''

The case of *Boe v. Hodgson Graham Co.,* 103 Wash. 669, 175 Pac. 310, is also a case of special bailment, in many of its features resembling the case we now have here. There the plaintiff had rented to the defendant a tug to be used in fishing; with the tug was furnished a captain, and the plaintiff was paid a lump sum for the services of both tug and captain; the defendant had on board the tug no one but a fish buyer. The tug was overloaded and as a consequence sank. The owner was not allowed to recover for the reason that the captain was in the control of the tug, the court observing:

''The dispute, in the final analysis, is therefore one of fact as to who was actually in charge of the boat, and who had the right and duty of looking after her safety, limiting her load, and directing her operations. The boat was not of sufficient size to come within the Federal registration law or to require a licensed master, and we must look to the evidence in the case to determine who was in fact her master. We think the evidence fairly establishes that the respondent employed the boat with Erickson, who had been her master at all times theretofore, placed Friend on board as a fish buyer only, with authority to direct when and where the boat should go in pursuit of the business in which he was employed, but that Erickson, who was fully advised as to her capacity and characteristics, was left free to operate her as he thought proper under these general directions. If the boat sank by reason of overloading, which seems probable, we think the fault lay with Erickson, the master and the representative of the owner; for, though he makes some rather uncertain statements as to having pro-

tested at the amount of the load, yet he does not deny that Friend asked him if they could safely take on another hundred fish, and he tacitly consented thereto and, after the loading was completed, he put the boat in motion without any protest as to the amount of the load and started out to sea without examination to see how much freeboard he had, without insisting upon the hatches being fastened down to prevent water which might come over the stern from pouring into the hold, and, in fact, without taking any precautions which a master should take to secure the safety of his boat. Friend knew no more about the capacity of the boat than could be learned by casual observation, while Erickson, who had operated her from the day she was built, must have known her capacity and her tendency to sink at the stern when in motion with a heavy load, if any one did."

That case, as the quotation shows, is distinguished from this cause by the fact that the engineer here was under the direction of the superintendent and conductor of the appellants, both by the terms of the contract and by the evidence of the witnesses.

The judgment must be modified, however, as it includes interest from the time of the accident. Under the long established rule, interest for unliquidated claims should only run from the time of the judgment.

In all other respects the judgment is affirmed.

MAIN, MITCHELL, and TOLMAN, JJ., concur.

CHADWICK, C. J. (dissenting)—I cannot distinguish this case from that of *Boe v. Hodgson Graham Co.*, 103 Wash. 669, 175 Pac. 310.

The majority has inclined to a general definition of the word "control," whereas the word, under the authorities cited, should be given that meaning which will serve the true, and as I believe, the evident, intent of the parties. The reservation of a right to furnish a competent man to operate the engine was

for the purpose of protecting the instrumentality from misuse and negligent operation. It was to protect the engine in all things that might depend upon technical skill or knowledge. The majority say:

"The control of the engine and the engineer in the use of the engine for the purpose for which it was leased to be in the hands of the lessee, the engineer taking his orders from the officers and foreman of the logging company,"

and from this argue that the only duty the engineer owed to respondent was to keep the engine in fit running condition. The fallacy of this argument seems apparent, for the actual operation of the engine is as important and as much within the demand of technical skill as the filling of the grease cups, the cleaning of the grates, or the polishing of the brasses.

There were a certain number of cars loaded and ready to move. It is not contended that the foreman, conductor, or brakeman had any technical knowledge of the capacity of the engine. They were not at fault, then, when they stood by—and that is the legal effect of their conduct—and permitted the one whose competency respondent had vouched for to overload the engine. Negligence — what is negligence, and what is not negligence—has never been subject to arbitrary definition, and from the nature of things it cannot be, but we are not for that reason without a safe guide when deliberating the subject. What would a man of ordinary prudence and judgment have done under the same or a like set of circumstances? We may assume that we are men of ordinary prudence and judgment, and being so, would we have hesitated to follow the judgment of the one whom respondent had furnished because of his technical skill to protect its property? It may be said that appellants'

agents, who were not engineers, should have ordered the engineer to pull a lesser load. They might have ordered him to run without sand in the sand box or without sufficient water in the boiler to protect the crown sheet; but the answer to all such arguments is that, although appellants might fix the hours of work, direct which cars to move and where to move them, the engineer was not bound; indeed, he had been sent there to prevent any act which, but for the exercise of technical skill and judgment, might result in damage to the property of respondent.

The judgment should be reversed and the case dismissed.

### On Motion to Recall Remittitur.
#### [Decided September 9, 1919.]

Per Curiam.—The clerk inadvertently included the interest from the time of the accident, in the judgment in this cause. Appellants also claim that, inasmuch as they obtained a substantial modification of the judgment of the lower court, under the decisions of this court, the costs should be awarded against respondent. This contention is undoubtedly correct.

It is therefore ordered that the remittitur be amended to exclude the interest as above, and to award the costs of the action against respondent.