[No. 20622.   Department One.   January 9, 1928.]

ANDREAS CHRISTIANSEN, *Appellant,* v. AUGUST
MEHLHORN, JR., *et al., Respondents.*[1]

[1] MASTER AND SERVANT (172)—INJURY TO THIRD PERSON—SCOPE OF
    EMPLOYMENT. A painter, engaged in painting an elevator shaft,
    who assumed control over the janitor of the building in moving
    the elevator about at his direction to form one of his supports
    while at work, the janitor being merely loaned to him for that
    purpose by the owner of the building, cannot claim that the
    janitor, in disobeying one of his orders, was acting within the
    scope of his employment by the general master, or that the
    latter is liable for such negligent act.

[2] NEGLIGENCE (11-3, 40)—CONTRIBUTORY NEGLIGENCE—QUESTION FOR
    JURY. The contributory negligence of a painter, engaged in
    painting an elevator shaft, in not fastening his supporting plank
    more securely to the top of the elevator holding up one end
    of the plank, is a question for the jury, where the different ac-
    counts as to how the accident happened are much at variance
    in material and important particulars.

Appeal from a judgment of the superior court for
King county, Hall, J., entered October 7, 1926, upon
granting a nonsuit, dismissing an action in tort. Af-
firmed as to defendants Mehlhorn and reversed as to
defendants Lechner.

*Edwin H. Flick* (*H. Gordon Chute,* of counsel), for
appellant.

*Griffin & Griffin* and *Poe, Falknor, Falknor & Emory,*
for respondents.

MITCHELL, J.—This is an action by Andreas Chris-
tiansen to recover judgment on account of personal
injuries sustained by him, while working as an inde-
pendent contractor in painting an elevator shaft in
the Mehlhorn Building in Seattle. The shaft had space
for three elevators, but only the center one was

[1]Reported in 262 Pac. 633.

equipped with an elevator. The plaintiff was engaged in painting the walls of one of the unused spaces and, in performing the work, used a board to stand upon, one end of which was supported by blocks and tackles while the other end rested on the top of the elevator carriage. The work was being done at night. The elevator was operated by John Lechner, who was in the general employment of the owners of the building as night janitor and as night operator of the elevator, to accommodate the tenants and occasional callers. While painting, the elevator was not moved, and then, as needed, the elevator and board would be lowered a few feet for further painting. The third time the elevator was moved for this purpose, the board on which the plaintiff was standing dropped off the elevator, causing the plaintiff to fall to the bottom of the shaft and thereby severely injuring him. He sued August Mehlhorn, Jr., and his wife, as owners of the building, and John Lechner and his wife.

At the trial, it appearing that Mrs. Mehlhorn was in no way an owner of the property she was dismissed out of the case. The jury returned a verdict against the defendants. August Mehlhorn, Jr., separately and John Lechner and his wife for themselves, each, filed a motion for a judgment notwithstanding the verdict and in the alternative for a new trial. The trial court held that Lechner was the servant of the plaintiff at the time of the accident, and that the evidence showed that the plaintiff was guilty of contributory negligence, as a matter of law, which contributed to his injuries. Judgment was entered dismissing the action. Plaintiff has appealed.

As to the respondent Mehlhorn, we are of the opinion that the first ground of the court's holding was right and is decisive of the case. Lechner's duties as night janitor were principally to clean up the rooms

and halls in the building, though he had the additional duty of operating the elevator occasionally for tenants of the offices in the building. He was employed and paid by or on behalf of the owners of the building, Mehlhorn being one of such owners. The plan for doing the painting was adopted by the appellant. He prepared everything and fixed and adjusted it himself, with the assistance of Lechner in moving the elevator when and as directed by the appellant. On going to work that night, he asked Lechner if he was to help him with the elevator, and was answered in the affirmative. The elevator was not to be used except for the appellant, and it appears that, after it was placed to suit him, from time to time the janitor would go off cleaning the building, until called by the appellant by the ringing of the elevator bell. Appellant's understanding of his rights and duties and his control of Lechner in operating the elevator may be told in his own language, as follows:

"John Lechner took me up to the fifth floor, where I had my scaffolding, my plank and tackle already for to work. He let me out of the elevator, and then he told me how to get him when I wanted him, to ring the bell inside of the elevator. Well, I told John Lechner to let down the elevator so I could get on the top as we had to, away up in that ceiling, to reach it. He did. He let it down. I put my plank over on it and got my rope and plank on top of it, and I told John Lechner not to move it before I told him to. So then I went on top of the elevator and took hold of my ropes and plank, and I told John Lechner to go up. He went so high as we could go. My block got altogether so I could not pull it no higher, and I told him to stop. He stopped. At this time I could not get off the elevator and go down to ring the bell to get John Lechner, so I asked him if he could stay there until I got through with this stretch I was working on. He said he had so much to do he would come back in fifteen or twenty minutes. Well, I got through with my work before

that time.  I was sitting on the top of the elevator
waiting for him, and he came.  Well, I told John Lech-
ner I was ready to move down and I told him not to
move it before I told him to go down slow.  I went
over and loosened that rope.  The rope was fastened
in the lower block.  It is a kind of tie that painters do
that holds the scaffold.  I went over and loosened that
and went back to the top of the elevator, took hold of
this plank, pulled it to me and told John Lechner to
go down slow, and he went down about five or six feet,
and I told him to stop, and he stopped, and I went
over and fastened my rope, and John Lechner went
back to his work.  .  .  .  When I got through with
that strip, I work down off the elevator down on the
floor and reached my hand in the elevator and rang
the bell, as John Lechner showed me, to call him from
his work, and I waited there and he came.  I told John
Lechner, I said, 'Now don't move the elevator before
I tell you to go down slow.'  So I went up on the top
of the elevator and sat down and loosened my rope,
went back to the top of the elevator again and told
John Lechner to go down slow.  At this time, we had
an iron beam which goes across the shaft, which was
about a foot below my plank.  The iron beam goes
straight back to the shaft.  Along side of the elevator
it was parallel.  The beam that I passed was on the
end of the plank toward the elevator.  It intersected
the plank, that is, it was going in a direction parallel
with the side of the elevator.  I had my rope over to the
top of the elevator and I told John Lechner to go down
slow, and when I came to this iron beam I told John
Lechner to stop and he stopped.  At that time, I was
on top of the elevator.  He stopped and I pulled up
on the rope on that farthest end and took hold of this
end, what I had in my hand, and got it underneath the
iron beam and back to the top of the elevator again,
and then I told John Lechner to go down slow and he
went down about five feet below the beams, and I told
him to stop.  I went over and fastened my rope.  John
Lechner went back to his work and I finished my work.
I finished the back of the elevator shaft.  All I had to
do with the elevator, I just had to tell John Lechner

to move it. That is all. And stop. That is all the control I had of the elevator.''

It was on the occasion of moving the elevator the third time that the accident happened. Appellant's account of it is as follows:

''I rang the bell for John Lechner to come and I waited for him to come. I went on the top of the elevator. I told him, I says, 'Don't move the elevator before I tell you to go down slow,' and I went up on top of the elevator, went over and sat down on the plank and loosened my rope, and just as I got the rope in my right hand ready to raise up John Lechner dropped the elevator and the plank slid off this fartherest end, slid off the elevator and I went down through the shaft with the rope in my hands. I was about in the middle of the plank. I was just starting to get up. Mr. Lechner gave no warning at all. He just dropped it without any warning.''

[1] Appellant relies on authorities which, in our opinion, are not applicable here. Typical of that line is *Beatty v. Metropolitan Building Co.*, 63 Wash. 207, 115 Pac. 90, Ann. Cas. 1912D 528. In that case the injured man, an independent contractor, was engaged in electrical work in the bottom of an elevator shaft, and requested the elevator boy not to go below the second floor until notified by him, that it would be necessary for him to occupy the shaft at the bottom of the first floor for a few minutes. The operator assented but, ignoring or forgetting the arrangement, descended to the first floor and injured the workman, the operator being at that time engaged in his general duty of carrying passengers to and from the other floors. He was in no way engaged with the injured workman in his work. He was not engaged or loaned for that work. The man injured had no right or authority to order or direct the operator of the elevator, nor did he attempt to do so, but simply made a request in that respect. The case

of *Macale v. Lynch,* 110 Wash. 444, 188 Pac. 517, is cited, but in that case it was held that the evidence failed to establish, with that certainty necessary to enable us to say as a matter of law, who had the exclusive control and direction of the servant at the time of the accident. In *Walsh v. Riesenberg,* 94 App. Div. 466, 89 N. Y. Supp. 58, it was held that the evidence was insufficient to show that the elevator operator had been transferred as a loaned servant by the general master, and, at the time the accident happened in that case, the elevator operator was acting immediately under an order of his general master. The case of *Donovan v. Gay,* 97 Mo. 440, 11 S. W. 44, was an elevator case and similar to the *Beatty* case. The operator, at the time of the accident in that case, was not at all subject to the direction or control of the person injured.

Other authorities have been pressed upon our attention on behalf of the appellant, which we do not deem it necessary to review. An examination of them, however, shows, in our opinion, that they were cases in which it was severally held that there had not been any transfer of the servant to a new master.

In the present case, there can be no serious question about the transfer of Lechner to the service of appellant. Appellant's own testimony shows it and that, at the time of the accident, he had exclusive control over him. The only order of the general master that Lechner was obeying was that of reporting to the appellant as his new or immediate master, to which Lechner consented and with which he complied. Appellant gave orders directly to Lechner who responded or agreed to respond. He ordered him when, how far and at what speed the elevator should be moved. It was to remain still until he wished it moved, and, by his own testimony, the accident happened because Lechner disobeyed one of his immediate and positive orders not to move the elevator until he gave him

further directions. Lechner was under no order from Mehlhorn, the disobedience of which caused the accident, but was under the order of the appellant, his new master, according to appellant's own testimony. Under such circumstances, the rule is well settled that the first or general master is not liable. This rule is clearly stated in *Wiest v. Coal Creek R. Co.*, 42 Wash. 176, 84 Pac. 725, as follows:

". . . the law is well established that when one person lends his servant to another for a particular employment, the servant for anything done in that particular employment must be dealt with as the servant of the man to whom he is lent, although he remains the general servant of the person who lent him. *Rourke v. White Moss Colliery Co.*, 2 C. P. D. 205; *Grace & Hyde Co. v. Probst*, 208 Ill. 147, 70 N. E. 12; *Consolidated Fireworks Co. v. Koehl*, 190 Ill. 145, 60 N. E. 87."

In *Locomotive Exchange v. Rucker Brothers*, 106 Wash. 278, 179 Pac. 859, it was held:

"The question as to whose agent or employee the engineer was is one which is resolved by the determination as to who controlled him; the question of his pay or of his selection are material only as they may throw light upon the question of control . . . Where such control exists, the person under the control is the employee of the one controlling him."

The court then quotes from *Olsen v. Veness*, 105 Wash. 599, 178 Pac. 822, as follows:

"To our minds, the question of control of operation is the determining factor in this case. The respondents, in the course of business, had transferred the vehicle and driver to the control of the hirer, who alone could say where and in what the work of the truck should thereafter consist, and if this effected a transfer of control it must, *ipso facto*, have effected a transfer of responsibility."

Other cases to the same effect are *Christiansen v. McLellan*, 74 Wash. 318, 133 Pac. 434, and *Carter v. King County*, 120 Wash. 536, 208 Pac. 5.

We think the trial court correctly held that Lechner was the servant of the appellant and acting as such at the time of the accident.

[2]  With respect to the matter of appellant's contributory negligence as affecting his right to recover against Lechner and wife, other and further facts in the case must be considered.  The board upon which appellant stood while painting was rather securely fastened to the blocks and tackle that supported that end, and to lower that end as and when required, a pulley was adjusted in such way that by the use of a rope through it that end could be lowered.  The other end of the board, as already stated, rested upon and extended over the top of the elevator carriage about five inches.  In the argument here, it is said on behalf of respondents that, to use the board, with only five inches of one end resting on the elevator without lashing or fastening it to the elevator, was inherently dangerous—and there was considerable testimony to that effect—and that it constituted contributory negligence.

Further, there was testimony upon which the argument is based that there was a safe way to prepare staging by fastening it to a stationary upright beam in the elevator shaft.  But these things do not answer the question in this case.  The plan used was the one actually adopted by the appellant, and there is no contention that Lechner was unaware of the use of the board.  Had the end of the board been lashed to the elevator carriage as suggested by the respondent, it would appear from the evidence in this case that the jury should be left to say whether it would have held and been safe on lowering the elevator carriage while the other end of the board was stationary.  But these considerations are beside the question.  There was abundant evidence here that the board as arranged

was safe for use as long as the elevator was still. The appellant testified that, in both practice and theory, the elevator was not to be moved until after he had untied the rope at that end of the board and gotten back safely on the top of the elevator and ordered the elevator lowered, slowly paying out the rope so as to let the board go down with the elevator. That plan had been followed successfully, as he testified, and it was only because Lechner refused or failed to follow orders the third time it was moved and lowered and while appellant was on the board and before he had returned to the place of safety that the accident happened. It was the lowering of the elevator, at a time when the appellant was on the board, that was the proximate cause of the accident. The appellant says it was lowered contrary to orders. On the other hand, Lechner testified:

"He never told me that he was going to go from this end of the plank, where he was sitting, back to the top of the elevator before I should start."

He further testified that, each time he lowered the elevator, the appellant sat on the board, where he could be easily seen by Lechner from his position at the controller used in operating the elevator. His version of how the accident happened was as follows:

"I got in the elevator and I did just the same as before. I looked to see whether he was there and was ready and I started and I lowered him, I should judge, well maybe two feet or two and a half, and I stopped and I swung my head and I looked and he says, 'Four feet farther,' and I started again. I didn't stop at the beam. He says—let me explain this to you; when I came up he was sitting on the plank and I looked in on him, and he says, 'Well go down to that beam; about six feet farther,' and then I stepped into the elevator, stepped right into the elevator and got to my controller, and I could throw my head around

to see whether he was ready, and he was ready and I started out. He said, 'All ready.' I lowered him two and one-half feet and stopped and I swung my head naturally. I could look through the grating and see him up there, and he says, 'Four feet farther,' and I started it again and he fell.''

These different accounts of the accident are so much at variance with each other in material and important particulars that we are of the opinion that the question of contributory negligence of the appellant was for the jury to determine rather than to be decided by the court as a matter of law.

As to the respondent Mehlhorn, the judgment is affirmed. As to the respondents Lechner and wife, the judgment is reversed, with directions to the trial court to pass upon their motion for a new trial.

MACKINTOSH, C. J., TOLMAN, ASKREN, and PARKER, JJ., concur.